**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**ADRIAN S. BOOTH,**

     **Plaintiff,**

**v.**                                    **Case No. 3:10-cv-00826**

**MICHAEL J. ASTRUE,
Commissioner of the Social
Security Administration,**

     **Defendant.**

**<u>MEMORANDUM OPINION</u>**

This is an action seeking review of the decision of the Commissioner of Social Security (hereinafter the "Commissioner") denying Claimant's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401-433. (Docket No. 1). Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 3 and 4). The case is presently pending before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 9 and 10).

**I.**    **<u>Procedural History</u>**

Plaintiff, Adrian S. Booth (hereinafter "Claimant"), applied for DIB benefits on June 9, 2004, alleging disability beginning December 5, 2002 due to "open heart surgery, breast bone moves and pops." (Tr. at 24 and 95). The application was denied initially and upon reconsideration. (Tr. at 24). Thereafter, Claimant

requested an administrative hearing, which was held on May 1, 2007 before the Honorable Algernon Tinsley, Administrative Law Judge (hereinafter the "ALJ"). (Tr. at 1047-1095). By decision dated January 12, 2008, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 24-33).

The ALJ's decision became the final decision of the Commissioner on May 6, 2010 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).  On June 16, 2010, Claimant brought the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Docket No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties have filed their Briefs in Support of Judgment on the Pleadings. (Docket Nos. 6, 7, 9 and 10).  Therefore, the case is ripe for resolution.

## II.   <u>Summary of the ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability.  See *Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972).   A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims.  If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied.   20 C.F.R. § 404.1520.   The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment.  *Id.* §

404.1520(b).  If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c).  If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d).  If impairment does, then the claimant is found disabled and awarded benefits. However, if the impairment does not, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments.  *Id.* § 404.1520(e).  After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f).  If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to produce evidence, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences.  *Id.* § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983).  The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy.  *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review." 20 C.F.R. § 404.1520a. First, the SSA evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. If such impairment exists, the SSA documents its findings. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the SSA compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual function. 20 C.F.R. § 404.1520a(d)(3).

In this particular case, the ALJ determined, as a preliminary matter, that Claimant met the insured status requirements of the Social Security Act through

December 31, 2009. (Tr. at 26, Finding No. 1).  The ALJ found that Claimant satisfied the first step of the sequential evaluation, because he had not engaged in substantial gainful activity since the amended disability onset date; that being, January 17, 2005. (Tr. at 26, Finding No. 2).[1]  Under the second inquiry, the ALJ found that Claimant suffered from severe impairments of pain, back and stomach; diabetes mellitus; chest discomfort (status-post surgery); and depression.[2] (Tr. at 26-28, Finding No. 3). At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any impairment included in the Listing. (Tr. at 28-29, Finding No. 4). The ALJ then found that Claimant had the following residual functional capacity:

> [L]ight work except [he] should avoid work in concentrated temperature extremes or around hazards (heights, moving machinery). Further, he has no medically determinable mental impairment with only mild limitations in activities of daily living, social functioning, or concentration, persistence or pace, and no episodes of decompensation.

(Tr. at 29-32, Finding No. 5).

As a result, Claimant could not return to his past relevant employment as a fast food worker, defined by the vocational expert as light to medium, low-level semi-skilled work, or as a glass worker, defined as heavy to very heavy, skilled work. (Tr. at 32, Finding No. 6). The ALJ considered that Claimant was 43 years

---

[1] The ALJ's written decision is somewhat confusing on this point.  However, during the administrative hearing, Claimant testified that he worked as a cook at Burger King from 2003 through January 17, 2005, when he was admitted to the hospital for a bowel resection.  He has not worked since that time.  Accordingly, at the hearing, Claimant orally modified his disability onset date from December 5, 2002 to January 17, 2005.  (Tr. at 1055-1057).

[2] Once again, the ALJ's written decision is perplexing.  In the third finding, the ALJ identifies Claimant's depression as a severe impairment; however, in the explanatory paragraph following the finding, the ALJ analyzes Claimant's depression/anxiety using the "special technique" and concludes that Claimant's depression is "non-severe."

old[3] at the time of the disability onset date, which classified him as a "younger individual age 18-49," and that he had a high school education and could communicate in English. (Tr. at 32, Finding Nos. 7 and 8). The ALJ noted that transferability of skills was not an issue, because the Medical-Vocational Rules supported a finding of "not disabled" regardless of whether Claimant had transferable job skills. (*Id.*, Finding No. 9). In view of these factors and based on the evidence of record and a vocational expert's testimony, the ALJ concluded that Claimant could perform jobs such as light level non-clerical office helper; cashier; surveillance monitor; and product inspector, all of which existed in significant numbers in the national and regional economy. (Tr. at 32-33, Finding No. 10). On this basis, the ALJ determined that Claimant was not under a disability as defined by the Social Security Act. (Tr. at 33, Finding No. 11).

## III.   <u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying Claimant's application for benefits is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined substantial evidence as the following:

> Evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

---

[3] Actually, Claimant was 45 years old on the amended disability onset date, but still fell within the "younger individual" classification.

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972), quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d585, 589 (4th Cir. 2001). The Commissioner, not the court, is charged with resolving conflicts in the evidence. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). As such, the Court will not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. *Id.*  The Court's obligation is to "scrutinize the record as a whole to determine whether the conclusions reached are rational." *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974). The ultimate question for the Court is whether the decision of the Commissioner is well-grounded, bearing in mind that "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner]." *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).

A careful review of the record reveals that the decision of the Commissioner is supported by substantial evidence.

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant challenges the decision of the Commissioner on two grounds. First, he contends that the ALJ erred by not finding Claimant's impairments to be medically equivalent to conditions outlined in the Listing.  According to Claimant, the combined effect of his exertional and non-exertional impairments "demands such a conclusion." (Pl. Br. at 5).   Second, Claimant argues that the ALJ improperly determined that he was less than credible when describing the

intensity, persistence, and limiting effects of his symptoms.    (Pl. Br. at 5-7).

Claimant emphasizes that the medical records and his allegations are "mutually

supportive;" thereby, meeting the exacting requirements of the Social Security Act.

[4]   (Pl. Br. at 6).

In response, the Commissioner asserts that Claimant's impairments do not

attain a level of severity that would support a finding that Claimant is disabled;

particularly, when considering that Claimant's functional limitations are minimal.

(Def. Br. at 4).   In addition, the Commissioner argues that Claimant improperly

relies upon examinations and reports that pre-date the alleged onset of disability

and were created at a time during which Claimant was working full-time.  (Def. Br.

at 5-6).   Accordingly, Claimant's activities during this time frame are direct

evidence of his ability to work.  The Commissioner adds that Claimant's medical

condition during the alleged period of disability did not substantially differ from

his condition during periods of substantial gainful activity.   Consequently,

Claimant is hard-pressed to carry his burden of proof.

Having thoroughly considered the evidence and the arguments of counsel,

the Court finds that the decision of the Commissioner is supported by substantial

evidence and should be affirmed.

**V.**    **Claimant's Background**

Claimant was born in 1959 and was nearly 48 years old at the time of his

administrative hearing. (Tr. at 20). He was a high school graduate and could speak

---

[4] Claimant also argues that the ALJ failed to fully develop the record in regard to Claimant's
psychological restrictions; however, this argument is offered as one element of the overall criticism
that the ALJ incorrectly evaluated Claimant's credibility.  Thus, this issue will be addressed as part
of the Court's review of the ALJ's credibility determination.

and read English. (Tr. at 20). In the years preceding his alleged onset of disability, Claimant was employed for twenty two years as a mold-maker at Pilgrim Glass factory and two years as a cook at Burger King. (Tr. at 1054-1057).

## VI.   **Relevant Medical Evidence**

The Court reviewed the Transcript of Proceedings in its entirety, including the medical records in evidence. To the extent that the Claimant's medical treatment and evaluations are relevant to the issues in dispute, the Court summarizes them as follows:

### A.  **Treatment for Alleged Physical Impairments**

At the administrative hearing, Claimant alleged three severe physical impairments; including, chest discomfort post open heart surgery with shortness of breath; musculoskeletal and stomach pain; and diabetes mellitus. (Tr. at 1058). Records which pre-date the amended disability onset date of January 17, 2005 are mentioned only to the extent that they help elucidate the onset and severity of Claimant's alleged physical impairments.

On October 2, 1991, Claimant was operating a machine at Pilgrim Glass factory and developed severe back and bilateral leg pain, right greater than left, going down to his feet. (Tr. at 169). An MRI of the lumbar spine revealed a focal central disc herniation with associated vertebral end plate osteophyte formation at T11-12 producing a slight appearance of impingement upon the conus medullaris. (Tr. at 167). Claimant was placed on temporary disability and received physical therapy for approximately two months, which helped him considerably. (Tr. at 162). On December 16, 1991, Claimant's physician noted that Claimant had recovered from the lumbar sprain and was released to return to work. (*Id.*).

On June 4, 1997, Claimant presented to Dr. Terrance Triplett, a family physician affiliated with Huntington Internal Medicine Group ("HIMG"), complaining of chest and arm pain lasting for three weeks.  (Tr. at 172).  He reported that the pain had started as intermittent sharp jabs and had developed into a diffuse ache.  He complained of shortness of breath, although Dr. Triplett did not feel this was exertional dyspnea. (*Id.*).  Claimant was noted to be overweight, with a blood pressure of 96/60 and a family history of cardiac disease.  Dr. Triplett ordered a stress test, which was normal.  (Tr. at 171).  A chest x-ray was also normal.  (Tr. at 190).  Dr. Triplett diagnosed atypical chest pain and hypercholesterolemia and prescribed Lopid.  (Tr. at 188, 191).  On December 17, 1997, Dr. Triplett saw Claimant in follow-up and documented that Claimant was doing well, with his hyperlipidemia and atypical chest pain stable and well-controlled.  (Tr. at 188).

On August 10, 2002, Claimant went to the Emergency Department at Kings' Daughters Medical Center ("KDMC") complaining of abdominal pain.  (Tr. at 801-802).  He was treated and released in good condition.  An abdominal x-ray showed cardiac enlargement, low lung volumes, and an abnormal nonspecific bowel gas pattern.  (Tr. at 808).

On August 19, 2002, Claimant went to Dr. Triplett's office at the urging of KDMC for evaluation of the abnormal x-ray findings.  (Tr. at 186).  He was evaluated by Todd Lester, a Physician's Assistant. (*Id.*).  After ordering a series of tests, which included pulmonary function studies, Mr. Lester advised Claimant that his cholesterol was slightly elevated and his pulmonary studies showed some impairment that responded to therapy.  (Tr. at 178).  Claimant was prescribed

Advair and Proventil inhalers; was counseled to quit smoking; and told to return in two weeks for recheck.  (*Id.*).  When Claimant returned, he was doing very well on the inhalers and was using a nicotine patch to quit smoking.  He had no other problems.  (Tr. at 176).

Claimant next presented to KDMC on December 1, 2002, complaining of shortness of breath and atypical chest pain.  (Tr. at 211).  He was diagnosed with congestive heart failure and referred to Dr. Richard Paulus, a cardiologist, for immediate consultation.  (Tr. at 208-209).  Dr. Paulus ordered an echocardiogram, which revealed left ventricular hypertrophy and elevated pulmonary artery systolic pressure.  (Tr. at 256).   Dr. Paulus performed a cardiac catheterization and found coronary artery disease and mild RCA stenosis.  (Tr. at 255).   He recommended bypass surgery with an IMA to the LAD.[5]  (Tr. at 611).

On December 5, 2002, Dr. Robert Fried performed a successful coronary bypass graft on Claimant.  (Tr. at 203-204).  Claimant developed labored breathing post-operatively, which was treated with respiratory therapy and ventilatory support.  (Tr. at 201-202).  Upon discharge from the hospital, Claimant attended cardiac rehabilitation sessions.   (Tr. at 896).   By March 2003, Claimant had improved and was able to walk about one mile each day and work in the yard and garden.  (Tr. at 871-874).  On April 4, 2003, Claimant reported that he planned to join the YMCA to continue his lifestyle changes.  (Tr. at 859-862).

---

[5] IMA stands for the Internal Mammary Artery, which is a blood vessel located in the chest cavity near the left anterior descending ("LAD") coronary branch.  The IMA can be transferred down the heart surface to use as a bypass graft to the coronary vessels for the relief of angina.  The IMA is remarkably resistant to cholesterol buildup and is associated with improved long term results from coronary bypass surgery.  *The Heart Surgery Forum, Forum Multimedia Publishing LLC, 2011.*

On September 5, 2003, Claimant presented to the office of Mushtaque Ahmed, his family physician, complaining of pain in his chest; a knot at the bottom of his bypass incision; shortness of breath; and swelling, cramping, and burning feet. (Tr. at 636). Dr. Ahmed told Claimant to speak with Dr. Herrer regarding his prominent scar, to continue taking his medications, and to increase his dose of Lipitor. (*Id.*). Dr. Ahmed sent Claimant to Dr. Paulus to evaluate the complaint of shortness of breath. On October 9, 2003, Dr. Paulus wrote to Dr. Ahmed, confirming that he had evaluated Claimant and performed a stress test. (Tr. at 607). Dr. Paulus indicated that the stress test was normal, and he reassured Claimant regarding the results. (*Id.*).

On August 23, 2004, Claimant returned to Dr. Ahmed's office with complaints of abdominal pain. (Tr. at 626). Dr. Ahmed surmised that Claimant could be experiencing the symptoms of diverticular disease. (*Id.*). He recommended a high fiber diet. Otherwise, Claimant's condition was noted to be fairly stable. (*Id.*).

Claimant underwent an annual stress test on November 4, 2004. (Tr. at 606). The test showed normal functional capacity, a few isolated PVC's, and a normal response of blood pressure to the exercise. (*Id.*). A concurrent Myoview examination revealed normal uptake of Myoview with no evidence of ischemia or old myocardial infarction. Claimant also had normal LV function. (*Id.*). However, on a follow-up visit to discuss the test results, Claimant complained of a deep discomfort in his chest that occurred once a week for several months and was unrelated to physical activity. He reported that during these episodes, he became short of breath, sweaty, and fatigued. (Tr. at 376-377). An electrocardiogram

demonstrated inverted T waves in his septal leads prompting Dr. Paulus to recommend an elective left heart catheterization with possible angioplasty.  (*Id.*). The catheterization was performed on November 24, 2004 and showed a 70% proximal LAD stenosis and a right coronary artery with considerable plaque.  (Tr. at 379).  Dr. Paulus recommended medical therapy.

Two days later, Claimant presented to the Emergency Department at KDMC with a two day history of severe abdominal pain and intractable nausea and vomiting.  (Tr. at 405-407).  He was admitted to the hospital by Dr. Ahmed for further evaluation of the abdominal pain. A CT scan of Claimant's abdomen was performed, which revealed probable diverticulitis of the descending colon.  (Tr. at 419-420).  Dr. Ahmed consulted with Dr. John Morgenstern, a gastroenterologist. (Tr. at 395-396).  Dr. Morgenstern confirmed the diagnosis of mild to moderate diverticulitis by performing a sigmoidoscopy.  (Tr. at 393-394).   He prescribed Keflex and Flagyl; a low residue, low lactose diet; and recommended an outpatient colonoscopy in January 2005.  (Tr. at 393).

On January 18, 2005, Claimant was admitted to KDMC with a second bout of diverticulitis.  (Tr. at 458-461).  Claimant had been previously scheduled for an outpatient colonoscopy on the following day, so Dr. Morgenstern was consulted. Dr. Morgenstern examined Claimant and decided to cancel the colonoscopy and consult with a general surgeon to investigate the possibility of performing a left hemicolectomy procedure.  (*Id.*).  Dr. Mark Pack, the general surgeon, evaluated Claimant and recommended a sigmoid colectomy to lessen Claimant's risks and problems associated with recurrent diverticulitis.  (*Id.*).  Claimant agreed to the procedure, and it was performed the following day.  (Tr. at 456-457).   The surgery

went without complication.  Claimant generally obtained a good result with a decrease in episodes of abdominal pain.  (Tr. at 530).

In July 2005, Claimant saw Dr. Ahmed for routine follow-up.  (Tr. at 619).  He complained of some pain around his belly button related to the hemicolectomy surgical scar and some shortness of breath.  He continued to complain of shortness of breath at his July 2005 visit, so Dr. Ahmed recommended that he lose weight.  (Tr. at 618).  Dr. Ahmed noted his impressions that Claimant had an umbilical hernia from his colon surgery and hyperglycemia, with a blood sugar of 142.  (*Id.*).

On September 13, 2005, Claimant was scheduled to have a surgical repair of his umbilical hernia at KDMC.  (Tr. at 746-751).  During his preparation for surgery, Claimant began to complain of chest pain and pressure, so he was taken to the Emergency Department.  A chest x-ray and laboratories studies were essentially normal, so Claimant was discharged with instructions to see Dr. Ahmed in three days. (*Id.*).  Six days later, he completed a stress test, which revealed no worrisome findings.  (Tr. at 605).

On October 18, 2005, Dr. Pack performed the umbilical hernia repair that was scheduled in September.  (Tr. at 652-653).  Claimant tolerated the procedure well with minimal blood loss. However, he presented to the Emergency Department at KDMC the following day complaining of abdominal pain, swelling and drainage. (Tr. at 709-713).  Claimant was diagnosed with a seroma[6] and was provided pain medication with instructions to rest.

On September 7, 2006, Claimant had his annual cardiac evaluation.  (Tr. at

---

[6] A seroma is a collection of serum in the body that resembles a lump or swelling and is sometimes seen post-operatively.  *Dorland's Medical Dictionary.*

738-739).  His exercise stress test and Myoview examinations showed evidence of ischemia.  (*Id.*).  Accordingly, he was sent to Dr. Paulus for examination and possible intervention.  (Tr. at 810-811).  Claimant's history and physical examination were dictated by Brian Davis, Dr. Paulus' nurse practitioner, who documented that Claimant had angina, coronary artery disease, diabetes mellitus treated with Glucophage, chronic obstructive pulmonary disease, hyperlipidemia, and hypothyroidism.  (*Id.*).  Based upon Claimant's history and symptoms, Dr. Paulus recommended an elective left heart catheterization with possible percutaneous transluminal coronary angioplasty.  (*Id.*).  The procedure was completed on September 14, 2006 and revealed some plaque formation and stenosis; however, the IMA graft was patent to the LAD.  (Tr. at 812).  Therefore, Dr. Paulus recommended only risk factor modification and medical therapy.

On February 11, 2008, Claimant had his routine cardiac evaluation.  (Tr. at 957-959).  The stress test was stopped due to Claimant's shortness of breath, although the Myoview scan reflected a normal LV function.  (*Id.*).

In September 2008, Claimant was evaluated the KDMC's Sleep Medicine Center for insomnia and sleep disorders.  (Tr. at 965-979).  He was diagnosed with severe obstructive sleep apnea, hypersomnia, and obesity.   (Tr. at 979).  Pulmonary function tests confirmed that Claimant suffered from moderate obstructive airway disease and a possible restrictive disease, such as pleural or chest wall disease.  (Tr. at 962).

On July 15, 2009, Claimant was evaluated by Dr. Laura Reese at KDMC for chronic right shoulder pain.  (Tr. at 1041).  He reported a history of anxiety; depression;     diabetes;     coronary     artery     disease;     hypertension;

hypercholesterolemia; benign prostatic hypertrophy; and thyroid disease. Dr. Reese diagnosed Claimant with right shoulder capsulitis with chronic impingement syndrome and bursitis. (Tr. at 1040). She recommended manipulation under anesthesia, which was performed the same day. (Tr. at 1044-1045). During the procedure, Dr. Reese identified a non-full thickness tear of the supraspinatus undersurface, which she debrided. Dr. Reese performed a chondroplasty and removed bursal tissue with a shaver and electrocautery. Claimant had no complications from this procedure. (*Id.*).

### B.    Treatment for Alleged Mental Impairments

Claimant alleges mental impairments of depression and anxiety. From a review of the medical information in evidence, the undersigned observes that these conditions are documented in multiple records as part of Claimant's medical history; particularly, in more recent records. However, records reflecting the evaluation and treatment of Claimant's psychiatric conditions are sparse. On August 23, 2004, Dr. Ahmed notes that Claimant has an anxiety disorder and prescribes Ativan. (Tr. at 626). He confirms that impression on October 6, 2004 and again prescribes Ativan. (Tr. at 625). These entries constitute the sum total of the medical documentation reflecting psychiatric evaluation or treatment.

### C.    Agency Evaluations

On November 19, 2004, Brian Bailey, a Master's level psychologist, performed a mental status examination and clinical interview of Claimant upon referral from the Disability Determination Section ("DDS"). (Tr. at 371-375). Claimant drove himself to the evaluation. He advised Mr. Bailey that his chief complaints were "anxiety and memory problems," explaining that he had low

frustration tolerance, increased irritability and excessive worry about his health and lack of income.  He also reported that his physician had restricted him to lifting no more than 40 pounds and this caused him to worry about completing basic household chores.  He indicated that he also was forgetful and had trouble recalling names and dates.  Claimant denied receiving any mental health services in the past and did not include any psychiatric medications in the list of his current medications. (*Id.*).  At the time of the interview, Claimant was working full-time at Burger King and was in charge of morning breakfast items.  He advised Mr. Bailey that he had worked for Pilgrim Glass from 1981-2002 and only left when the plant closed. He described his average day as waking at 3:00 a.m., working seven hours, watching television, playing on the computer, and taking short naps.  He was independent in grooming and personal hygiene activities and performed some simple household chores.  He generally went to bed around 9:00 p.m.  (*Id.*).  Mr. Bailey diagnosed Claimant with a mixed anxiety-depressive disorder that did not meet criteria for a specific anxiety disorder. He felt Claimant's anxiety was clinically significant, but found his concentration, persistence, pace, memory, insight, thought content and thought processes to be either normal or no more than mildly deficient.  (*Id.*).

On December 1, 2004, Dr. K.M. Monderewicz of Tri-State Occupational Medicine, Inc., performed an internal medicine evaluation on Claimant at the request of DDS.  (Tr. at 425-430).  Claimant advised Dr. Monderewicz that his primary medical problems were related to his open-heart surgery.  He described pain in his chest and moving and popping of his breastbone. Upon examining Claimant, Dr. Monderewicz noted no cough, wheezing or blood in the sputum;

normal blood pressure; normal eyesight; normal gait; normal memory; no tenderness over Claimant's chest incision; some duskiness of the lower extremities, as well as some mild edema; non-tender abdomen, without rebound, guarding or rigidity; normal musculoskeletal system; and normal neurological reflexes and muscle strength bilaterally. (*Id.*). Dr. Monderewicz's impressions included atypical chest pain status post by-pass surgery; history of congestive heart failure; protrusion and tenderness over the xiphoid process;[7] and moderate obesity. (*Id.*). He recommended that Claimant avoid heavy exertion until his cardiac status could be further assessed and concluded that Claimant's chest wall discomfort would at least moderately impair his ability to lift, carry, push and pull heavy objects. (*Id.*).

On January 4, 2005, a consulting physician, whose signature is illegible, completed a Physical Residual Functional Capacity Assessment. (Tr. at 448-455). The physician opined that Claimant could frequently lift 10 pounds and occasionally lift 20 pounds; could sit, stand and walk six hours each out of an eight hour workday; and was unlimited in the ability to push and/or pull. He found no postural, manipulative, visual, or communicative limitations. (*Id.*). The physician indicated that Claimant's only environmental limitation was to avoid concentrated exposure to extreme heat and cold. (*Id.*).

The following day, Dr. Robert Marinelli completed a Psychiatric Review Technique. (Tr. at 434-447). He determined that Claimant had the non-severe impairment of anxiety disorder, not otherwise specified. He rated Claimant's

---

[7] The xiphoid process is the third and lowest segment of the human sternum. *Merriam-Webster Dictionary*.

functional impairments as mild in areas including activities of daily life, social functioning, persistence, pace, and concentration. He found no instances of decompensation.

On October 13, 2005, Claimant presented to Penny Perdue, a Master's level psychologist, for a second mental status examination. (Tr. at 645-647). On this visit, Claimant complained of daily depression that began in 2002 after his open heart surgery. He reported weight gain; appetite changes; sleep difficulties; and poor energy related to his physical problems. Claimant also indicated that he felt sad; had feelings of worthlessness; poor concentration; irritability; nervousness; worry; and occasional suicidal ideations without a plan. Ms. Perdue diagnosed Claimant with anxiety disorder, not otherwise specified, and opined that he had a fair prognosis for his psychological difficulties. She indicated that Claimant's activities included caring for his own grooming and hygiene, making simple foods, watching television, and attending twice monthly meetings at the Masonic Lodge. She found Claimant's persistence and social functioning to be normal, but his pace was mildly slow. Based upon this updated examination, DDS requested an updated Psychiatric Review Technique from Dr. Joseph Kuzniar. (Tr. at 724-737). Dr. Kuzniar determined that Claimant had depressive symptoms and an anxiety disorder, not otherwise specified. His rating of Claimant's functional limitations matched those of Dr. Marinelli. (*Id.*).

Dr. T. Lauderman completed a second Physical Residual Functional Capacity Evaluation on December 16, 2005. (Tr. at 716-723). His conclusions regarding Claimant's exertional limitations mirrored the findings made in January 2005. However, regarding non-exertional limitations, Dr. Lauderman opined that

Claimant was somewhat limited in his ability to climb, balance, stoop, kneel, crouch and crawl.   He found no communicative, manipulative, or visual limitations, but felt Claimant should avoid concentrated exposure to extreme temperatures, fumes, odors, dust, gases, poor ventilation and hazards such as machinery and heights.   (*Id.*). Dr. Lauderman did not find Claimant to be entirely credible in his statements about his symptoms and limiting effects, because they were not entirely consistent with the other evidence reviewed by Dr. Lauderman.

## VII.   Analysis

The Court considers each challenge raised by Claimant and rejects them as follows.

### A.   Medical Equivalency to a Listed Impairment

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing.   The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity."   *See* 20 C.F.R. § 404.1525.   Inasmuch as the Listing concedes an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria."   *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990). Similarly, "[f]or a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. . . .A claimant cannot qualify for benefits under the 'equivalency' step by showing that the overall functional impact of his unlisted

impairment or combination of impairments is as severe as that of a listed impairment." *Id.* at 531.[8]

Claimant makes the conclusory statement that his physical and mental impairments in combination "obviously" equal a listed impairment. However, Claimant fails to identify which listed impairment applies to his constellation of conditions. By contrast, the ALJ identified all of the body systems contained in the Listing that included potentially applicable medical conditions, thoroughly examined the most similar listings under each section, and explained why Claimant did not meet or medically equal the criteria set forth in each.[9] (Tr. at 28-29). The ALJ indicated that Claimant could not meet the criteria contained in Section 1.00 dealing with the musculoskeletal system, because he had no evidence of spasms; had normal range of motion, reflexes, straight leg raising, and muscle strength; and no positive neurological symptoms. (Tr. at 28). Claimant's digestive symptoms did not meet the criteria in Section 5.00 of the Listing, because he produced no evidence of esophageal impairment; weight loss; bloody stools; intermittent obstruction; fistula formation; or recurrence of severe symptoms after

---

[8] The Supreme Court explained the equivalency concept by using Down's syndrome as an example. Down's syndrome is "a congenital disorder usually manifested by mental retardation, skeletal deformity, and cardiovascular and digestive problems." *Id.* At that time, Down's syndrome was not an impairment included in the Listing. Accordingly, in order to prove medical equivalency to a listed impairment, a claimant with Down's syndrome had to select the single listing that most resembled his condition and then demonstrate fulfillment of the criteria associated with that listing.

[9] The ALJ examined Section 1.00, Musculoskeletal System; Section 3.00, Respiratory System; Section 4.00, Cardiovascular System; Section 5.00, Digestive System; and Section 9.00, Endocrine System. He did not consider Section 12.00, Mental Disorders, because Claimant's psychiatric impairments were considered non-severe based upon the lack of significant paragraph B criteria.

colectomy. (*Id.*). The findings pertinent to Claimant's endocrine system did not meet any impairment included in Section 9.00 of the Listing, because Claimant showed no signs of neuropathy; acidosis; persistent disorganization of motor function; or retinitis proliferans. (*Id.*). Similarly, Claimant's chest pain and shortness of breath were not equivalent to the listed impairments in Sections 3.00 and 4.00, because his stress tests and pulmonary function studies simply did not meet the numerical laboratory and test result values necessary to equal the criteria set forth in the listings. (*Id.*).

Accordingly, the Court finds that the ALJ fully considered the issue of the medical equivalency of Claimant's combined impairments to the criteria set forth in the most applicable listed impairments and correctly eliminated each one. As such, the ALJ's ultimate conclusion that Claimant's impairments did not rise to the severity level of any condition outlined in the Listing was supported by substantial evidence.

**B.    Claimant's Credibility**

Claimant argues that the ALJ erred in finding Claimant less than credible when describing the persistence, intensity, and limitations associated with his symptoms. He asserts that his medical evidence and testimony were "mutually supportive;" therefore, he should be afforded full credibility. Claimant also takes issue with the ALJ's weighing of the evidence. According to Claimant, the overall weight of the evidence supports a finding of disability. He argues that the ALJ's rejection of opinion evidence supporting the strength of his credibility is especially prejudicial, because if he is found fully credible, the vocational expert's testimony substantiates a finding of disability. In particular, Claimant points to the reports

of two consultative psychologists, who found Claimant to be credible and argues that the ALJ rejected these opinions, yet failed to explain the reasons underlying that rejection.[10]

To the contrary, the Commissioner contends that Claimant is unduly focused on a report of examination that occurred prior to his amended disability onset date. Because the report pre-dated the relevant time frame, the ALJ was permitted to overlook the results of the examination, as it was not probative of the question of disability. (Def. Br. at 5). The Commissioner also stresses that the ALJ fully complied with his duty to develop the record, because ample evidence existed upon which to base the ALJ's credibility determination. Having reviewed the evidence, the Court agrees with the Commissioner.

Medical source opinions are only one type of evidence that the ALJ may consider when making a credibility determination. Credibility determinations should be based on the totality of the evidence and not on one isolated fact, opinion, or inference. As the ALJ outlined in his decision, when making a credibility determination, he must consider multiple factors, including the Claimant's daily activities; evidence on the factors that participate or aggravate the

---

[10] Claimant also asserts that the ALJ failed to fully develop the record when he acknowledged that these two psychological consultants performed mental status examinations, but failed to provide medical source opinions on Claimant's mental RFC. (Pl. Br. at 6). This argument is without merit, because RFC opinions were prepared by other qualified consultants and were available to the ALJ. The ALJ's duty to develop the record does not mandate that he request additional or supplemental medical source opinions "as long as the record contains sufficient evidence for the administrative law judge to make an informed decision." *Ingram v. Commissioner of Social Security Administration,* 496 F.3d 1253, 1269 (11th Cir. 2007); See also, *Weise v. Astrue,* 2009 WL 3248086 (S.D.W.Va.). When considering the adequacy of the record, the Court must look for evidentiary gaps that result in "unfairness or clear prejudice" to the claimant. *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995). A remand is not warranted every time a claimant alleges that the ALJ failed to fully develop the record. Instead, remand is appropriate when the absence of available documentation creates the likelihood of unfair prejudice to the claimant. *Id.* In this case, the record was sufficiently robust to allow the ALJ to make a reasoned decision.

Claimant's symptoms; the type, dose, effectiveness, and side effects of treatment given to Claimant to treat his symptoms; the amount of treatment and other measures Claimant requires in order to function; and other evidence concerning Claimant's functional limitations and restrictions. *See* SSR 96-7p. In addition, the ALJ has the added benefit of observing and interviewing the Claimant at the administrative hearing.

Social Security Ruling 96-7p clarifies the two-step process by which the ALJ must evaluate symptoms, including pain, to determine their limiting effects on a claimant. *See, also* 20 C.F.R. §§ 404.1529 and 416.929. First, the ALJ must establish whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms. SSR 96-7P. Once the ALJ finds that the conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* Whenever the intensity, persistence or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. The Ruling sets forth the factors that the ALJ must consider in assessing the claimant's credibility, emphasizing the importance of explaining the reasons supporting the credibility determination. The Ruling further directs that the credibility determination must be based on a consideration of all of the evidence in the case record. *Id.*

When evaluating whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not simply replace its own *de novo*

credibility assessments for those of the ALJ; rather, the Court must review the evidence to determine if it is sufficient to support the ALJ's conclusions. "In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence . . . or substitute its own judgment for that of the Commissioner." *See Hays v. Sullivan,* 907 F.2d. 1453, 1456 (4th Cir. 1990). Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989-990 (4th Cir. 1984), citing *Tyler v. Weinberger*, 409 F. Supp. 776 (E.D.Va. 1976).

Here, the Court finds that the ALJ's credibility assessment of Claimant was consistent with the applicable regulations, case law, and Social Security Ruling and was supported by substantial evidence. 20 C.F.R. § 404.1529; SSR 96-7p; *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996). Considerable evidence existed in the record that Claimant's complaints of pain and psychological distress did not correlate with his reported level of activity, his functional abilities, and the objective medical records.

As stated in his written decision, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to produce her alleged symptoms, but his statements concerning their intensity, persistence, and limiting effects were not entirely credible when considering the evidence in its totality. On the issue of Claimant's musculoskeletal problems, the ALJ pointed out that Claimant had received only minimal treatment for his back and took no pain medications. (Tr. at 31). Likewise, although he claimed severe anxiety and depression, Claimant sought no psychiatric counseling; took no psychotropic

medications; and had no mental health hospitalizations.  Moreover, the exertional limitations placed on Claimant by his cardiologist and family doctor were not particularly stringent.  The most severe restrictions on Claimant's ability to function were suggested in December 2004 by an agency consultant.  However, the consultant explicitly noted that these recommendations were temporary in nature, lasting only until Claimant could have his chest pain reevaluated. Subsequent to that evaluation, Claimant underwent additional assessment and treatment of his cardiac symptoms by his treating physicians.  Notably, neither of these physicians recommended more severe restrictions. In fact, Claimant's treating physicians suggested that he increase his activity and implement or maintain lifestyle changes. For example, Dr. Ahmed urged Claimant to lose weight, and Dr. Paulus advised Claimant to continue walking one mile each day.

After reviewing the evidence, the ALJ expressly adopted the RFC findings of two agency consultants on the issue of Claimant's exertional capacity, limiting him to light work with specific environmental limitations. (Tr. at 32).  Relying upon the testimony of a vocational expert, the ALJ identified jobs in both the light and sedentary exertional range that could be performed by Claimant given his additional non-exertional limitations.[11]   The ALJ expressly confirmed that the vocational expert's testimony was consistent with the Dictionary of Occupational Titles.

---

[11] In fact, at the administrative hearing, the ALJ asked the vocational expert a hypothetical question that included a broader range of environmental limitations than those included in the ALJ's written RFC finding.  (Tr. at 1093).

Having scrutinized the ALJ's decision and the evidence in its totality, the Court finds that the ALJ thoroughly considered Claimant's complaints of pain and psychological distress, conducted a reasoned review of the evidence, and adequately explained the grounds underlying his credibility determination. Consequently, the ALJ's ultimate finding on this issue has substantial evidentiary support.

**VIII.  <u>Conclusion</u>**

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision **IS** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED** and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:**  June 3, 2011.

Cheryl A.  Eifert
United States Magistrate Judge

- 27 -